THEMIS
EXPERT WITNESS, LLC

RE: Philip Goldson v. JPMorgan Chase Bank, N.A.

To Whom It May Concern:

**Introduction and Credentials**

1. I, Alvaro Alban, MBA, was retained to evaluate the circumstances surrounding the reporting of a JPMorgan Chase Bank, N.A. consumer credit account, the subsequent disputes concerning that reporting, and the financial issues arising from those events. My assignment included reviewing the chronology of the reported account information, the documentation generated during the dispute process, the information furnished to the consumer reporting agencies, and the potential financial significance of the disputed reporting from the perspective of a financial expert.
2. In performing this assignment, I reviewed pleadings, discovery materials, consumer credit reports, dispute correspondence, communications between Mr. Goldson, JPMorgan Chase Bank, N.A., and the consumer reporting agencies, loan application records, adverse action notices, and other documents produced during this litigation. I also reviewed relevant industry literature and guidance concerning consumer credit reporting, Metro 2® reporting practices, and dispute investigations in order to evaluate the issues presented in this matter.

3. My analysis focuses on the financial reporting issues reflected in the available records, including the consistency of the information reported, the handling of repeated disputes, the reporting practices reflected in the documentation, and the potential financial significance of the disputed information. The opinions contained in this report are limited to financial analysis, consumer credit reporting practices, and accepted industry standards.

4. I earned a Master of Business Administration from Lehigh University and a Bachelor of Science degree from Cornell University. My academic training emphasized finance, accounting, economics, business management, and financial analysis, providing the educational foundation for evaluating financial records, commercial transactions, lending information, and business operations.

5. Since 2015, I have served as a Financial Expert providing independent financial analyses in state and federal litigation involving business valuation, financial damages, commercial disputes, accounting matters, lending transactions, and other matters requiring detailed evaluation of financial records and supporting documentation.

6. My professional practice routinely involves analyzing financial statements, accounting records, banking records, loan documentation, commercial transactions, and business records to determine whether financial information is internally consistent, accurately documented, and supported by the underlying evidence. This work requires the application of accepted financial analysis principles and the preparation of independent expert opinions based upon documentary evidence.

7. I have served since 2010 as Managing Member of Doctors' Office Urgent Care, LLC, an organization operating multiple outpatient urgent care centers located in Paramus, West

Caldwell, Manalapan, Brick, and Midland Park, New Jersey. I have also served as a Managing Member of Patient Care Now in Fairless Hills, Pennsylvania.

8. My combined experience as a financial expert and business executive has provided extensive experience evaluating the financial records and business documentation relied upon by lenders, financial institutions, businesses, and other organizations when making financial and credit-related decisions. This work includes the review of loan documentation, account histories, payment records, financial statements, and other records used to evaluate financial performance and creditworthiness.

9. Throughout my career, I have prepared numerous financial reports involving monetary damages, business valuation, commercial transactions, lending matters, accounting issues, and other financial disputes. These engagements require the evaluation of complex documentary evidence, reconciliation of inconsistent financial information, and development of opinions based upon accepted financial methodologies.

10. The issues presented in this matter involve evaluating consumer credit reporting records, dispute correspondence, lending documentation, and financial records to determine whether the information reported remained consistent throughout the reporting and dispute process. Evaluating those issues is consistent with the type of financial analyses I routinely perform in my financial expert practice.

11. My education, financial expert experience, and executive business management responsibilities have provided me with the knowledge and experience necessary to evaluate the financial reporting issues, lending-related records, and consumer credit reporting practices at issue in this matter.

12. Based upon my review of the materials provided, I evaluated whether the reporting associated with Mr. Goldson's account remained consistent with the underlying financial records, whether the dispute documentation reflected consistent treatment of the reported information, and whether the information furnished during the dispute process remained consistent throughout the chronology reflected in the available records. My opinions are based upon accepted financial analysis principles, industry guidance, and the documentary evidence reviewed.

13. As discussed in the sections that follow, it is my opinion, to a reasonable degree of professional probability within the field of financial analysis, that the available records more likely than not demonstrate an inconsistency between JPMorgan Chase's own records and correspondence identifying March 31, 2022 as the account's charge-off date and the April 2022 charge-off date that continued to be reported and verified during the dispute process.

14. From a financial reporting perspective, the consistency of information furnished to consumer reporting agencies is a fundamental component of reliable consumer credit reporting. The repeated verification of reporting that differed from Chase's own documented account history raises questions regarding the consistency of the information furnished during the dispute and reinvestigation process under accepted consumer credit reporting practices.

**Facts of the Case**

15. Upon information and belief, Philip Goldson maintained a JPMorgan Chase Bank, N.A. credit card account ending in X2315. According to Mr. Goldson's declaration, he held the account from approximately October 2019 until the account was charged off.

16. Records produced in this matter indicate that Mr. Goldson's last payment on the account was made on October 15, 2021. The same date was later identified in discovery admissions and in Mr. Goldson's dispute correspondence concerning the account. A true and correct copy of the Plaintiff's Motion for Summary Judgment is attached here as Exhibit A. A true and correct copy of initial disclosures identifying key witnesses, evidence, and a $30,000 damage computation for the case is attached as Exhibit B. A true and correct copy of the collection of dispute letters sent by Philip Goldson to TransUnion and Chase, along with TransUnion's investigation results is attached here as Exhibit C.

17. Chase records referenced in the litigation materials state that the account was charged off on March 31, 2022. A Chase letter dated August 9, 2024 advised Mr. Goldson that the account "was charged off on March 31, 2022," that the account was charged off with a balance of $38,238, and that Chase had reviewed the account history and found its reporting to be accurate. A true and correct copy of the formal letter from Chase dated Aug 09, 2024 is attached as Exhibit D.

18. TransUnion continued to report the account with a charge-off date identified as April 2022. The preliminary review materials characterize the difference between the March 31, 2022 charge-off date reflected in Chase records and the April 2022 reporting reflected on TransUnion credit reports as the central reporting issue in this matter. A true and correct copy of the preliminary review materials is attached here as Exhibit E.

19. Exhibit E indicates that the challenged reporting remained on Mr. Goldson's TransUnion credit file during the period from 2022 through at least 2024.

20. On July 12, 2024, Mr. Goldson submitted dispute correspondence to TransUnion and Experian concerning the reporting of the Chase account. In that correspondence, he

challenged the accuracy of the reported charge-off date and payment history information associated with the account, Exhibit C.

21. TransUnion opened an investigation concerning Mr. Goldson's dispute under File No. 416185917. On or about July 23, 2024, TransUnion completed its investigation and advised Mr. Goldson of the results. Following the investigation, the reporting continued to reflect an April 2022 charge-off date, Exhibit C.

22. Mr. Goldson continued to maintain that the reporting of the Chase account remained inaccurate following the July 2024 investigation, Exhibit C.

23. On July 31, 2024, Mr. Goldson submitted a follow-up dispute concerning the Chase account and also submitted a direct dispute to JPMorgan Chase Bank, N.A. challenging the reporting of the account, Exhibit C.

24. In that correspondence, Mr. Goldson identified what he believed to be inconsistencies in the reporting of delinquency and charge-off information associated with the account, Exhibit C.

25. On August 6, 2024, TransUnion advised Mr. Goldson that it would not investigate the dispute. The correspondence reviewed indicates that TransUnion cited concerns regarding third-party involvement in connection with the dispute submission, Exhibit C.

26. On August 9, 2024, Chase sent correspondence to Mr. Goldson stating that the account was charged off on March 31, 2022, reflected a charge-off balance of $38,238, and advised that Chase had reviewed the account history and determined that its reporting was accurate, Exhibit C; Exhibit D.

27. On August 23, 2024, Mr. Goldson submitted additional dispute correspondence to TransUnion concerning the reporting of the Chase account, Exhibit C.

28. Exhibit C indicates that Mr. Goldson advised TransUnion that he was not utilizing a credit repair organization and requested reinvestigation of the disputed reporting.

29. On or about September 11, 2024, TransUnion completed an additional investigation relating to the disputed reporting of the Chase account. Following the investigation, the reporting continued to reflect an April 2022 charge-off date, Exhibit C.

30. Mr. Goldson continued to dispute the reporting and maintained that the information furnished concerning the account remained inaccurate, Exhibit C.

31. On September 23, 2024, Mr. Goldson submitted correspondence characterized as an urgent request for reinvestigation concerning the Chase account reporting, Exhibit C.

32. In that correspondence, Mr. Goldson asserted that the results of the September 11, 2024 investigation did not demonstrate that a meaningful investigation had been conducted regarding the disputed reporting, Exhibit C.

33. The materials reviewed indicate that Mr. Goldson requested that TransUnion conduct an additional review of the disputed information and correct the reporting of the account, Exhibit C.

34. According to the litigation materials, consumer disputes concerning the account generated Automated Consumer Dispute Verification ("ACDV") requests that were transmitted to Chase for investigation and response, Exhibit E.

35. On October 23, 2024, Mr. Goldson submitted additional dispute correspondence to TransUnion concerning the Chase account. He characterized the correspondence as his fourth dispute letter regarding the reporting issue, Exhibit C.

36. In that correspondence, Mr. Goldson asserted that prior investigations had failed to resolve the disputed reporting and continued to challenge the reporting of the charge-off date, payment history information, and related account information, Exhibit C.

37. The October 23, 2024 correspondence reflects that Mr. Goldson provided TransUnion with a copy of Chase's August 9, 2024 letter, a copy of his identification, and proof of address in support of his dispute, Exhibit C.

38. The October 23, 2024 correspondence further reflects that Mr. Goldson requested correction of the charge-off date to March 31, 2022, correction of payment history information, inclusion of the last payment amount, and a written explanation of the investigation findings, Exhibit C.

39. The materials reviewed indicate that Mr. Goldson also submitted an additional direct dispute to Chase concerning the reporting of the account, Exhibit C.

40. On November 3, 2024, Chase issued additional correspondence confirming a charge-off date of March 31, 2022 for the account, Exhibit E.

41. The November 3, 2024 correspondence further stated that there was no date of last payment reported to the consumer reporting agencies. Subsequent discovery materials indicate that Chase later acknowledged that statement was mistaken, Exhibit A; Exhibit B.

42. On or about November 5, 2024, TransUnion issued an additional investigation result concerning the disputed reporting of the Chase account. Following the investigation, the reporting continued to reflect an April 2022 charge-off date, Exhibit C.

43. The preliminary review materials indicate that Mr. Goldson submitted a total of five disputes concerning the challenged reporting and that Chase verified the reporting in response to those disputes, Exhibit E.

44. The litigation materials further indicate that Chase received multiple Automated Consumer Dispute Verification forms concerning the disputed reporting during 2024. Chase admitted receiving at least three ACDV forms relating to disputes concerning the account, Exhibit A; Exhibit E.

45. According to the preliminary review materials, Chase discovery responses identified the March 31, 2022 charge-off date as information that was available, accessed, and reviewed during dispute investigations concerning the account, Exhibit E.

46. Chase did not modify the reporting after confirming the March 31, 2022 charge-off date and maintained that its furnishing of information was correct, Exhibit A.

47. Chase admitted that April 2022 was reported as the first full month that the account was charged off, Exhibit A.

48. According to discovery admissions referenced in the litigation materials, Chase made no collection attempts on the account between March 31, 2022 and January 22, 2025, Exhibit A.

49. On January 22, 2025, Chase asserted a counterclaim relating to the account in the present litigation, Exhibit A.

50. According to the preliminary review materials, Chase discovery responses and related records were identified as evidence concerning the information available to Chase during its investigations, the procedures utilized in responding to ACDV requests, and the handling of the disputed reporting, Exhibit A; Exhibit E.

51. Chase's verified discovery responses provide additional information concerning the ACDV investigations performed in response to Mr. Goldson's disputes. Chase admitted that the March 31, 2022 charge-off date for Mr. Goldson's account was "available to, accessed, and

reviewed in connection with each investigation" of the account, See a true and correct copy of Motion for Summary Judgement attached here as Exhibit G.

52. Chase also admitted that the ACDV processors involved in responding to consumer disputes are evaluated, in part, based on productivity, including the number of ACDV responses processed per hour, See Exhibit G.

53. Chase further admitted that none of the ACDVs relating to Mr. Goldson's account were flagged for audit. This is significant because the disputed reporting issue was not a single isolated dispute; the available materials indicate that Mr. Goldson disputed the same or substantially related Chase reporting issue multiple times, and Chase continued to verify the disputed reporting, See Exhibit G.

54. Chase's January 26, 2026 letter to the Court states that ACDV processors are employed by JPMorgan Services India Private Limited and that the processors do not have authority to exercise judgment and discretion, are required to follow Chase's policies and procedures, and exercise very little independent discretion when carrying out their responsibilities, See Exhibit G.

55. The excerpts from the deposition of Robert J. Wilkins, Chase's corporate representative and Vice President of Credit Bureau Operations, are also relevant to the reasonableness of Chase's investigation process. The materials indicate that Mr. Wilkins managed approximately 75 ACDV processors and testified concerning Chase's reporting and ACDV practices. The deposition excerpts should be considered in evaluating whether Chase's process allowed a meaningful reconciliation between the disputed consumer-reporting information and Chase's own account records, See Exhibit G.

56. On April 14, 2025, Mr. Goldson submitted a loan application to Liberty Savings Federal Credit Union seeking financing in the amount of $35,000 for the purchase of a vehicle. The application reflects that Mr. Goldson listed his address as 140 State Street, Apartment 1A, Hackensack, New Jersey, identified his employment as Head of Talent with Tidal Labs, reported monthly income of approximately $17,900, and requested an automobile loan in the amount of $35,000. A true and correct copy of an adverse action notice from Liberty Savings Federal Credit Union is attached here as Exhibit F.

57. Liberty Savings Federal Credit Union subsequently issued an Adverse Action Notice dated May 20, 2025 concerning the requested credit. The notice reflects that the requested loan amount was $35,000 and advises that the application could not be approved. The notice further indicates that information obtained from a consumer reporting agency was used in connection with the credit decision, Exhibit F.

58. The preliminary review materials identify the Liberty Savings Federal Credit Union loan application and subsequent adverse action notice as documents relevant to the chronology of events and to Mr. Goldson's contention that the disputed credit reporting affected his ability to obtain financing, Exhibit E.

59. On July 14, 2025, Mr. Goldson served Initial Disclosures in this action. In those disclosures, he identified Chase correspondence dated August 9, 2024 and November 3, 2024, TransUnion credit reports reflecting an April 2022 charge-off reporting date, dispute documentation, records relating to financing applications, and documentation of alleged credit denials as materials supporting his claims, Exhibit B.

60. The Initial Disclosures further state that Mr. Goldson contends the Chase account was reported with a charge-off date of April 2022 on TransUnion credit reports while Chase correspondence identified a charge-off date of March 31, 2022, Exhibit B.

61. On July 31, 2025, Mr. Goldson filed a Motion for Summary Judgment in which he asserted that Chase had admitted that the account was charged off on March 31, 2022, that Chase reported April 2022 as the first full month the account was charged off, that multiple disputes had been submitted regarding the reporting, and that the reporting was not corrected following those disputes, Exhibit A.

**Fair Credit Reporting Framework**

62. The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq., establishes a framework intended to promote fairness, accuracy, and reliability in the reporting of consumer credit information. From a financial reporting perspective, the consumer reporting system depends upon accurate, complete, and consistent information so that lenders, creditors, and consumer reporting agencies may make informed credit decisions. *Fair Credit Reporting Act, 15 U.S.C. § 1681(b)*; *Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(1)*.

63. Within that framework, consumer reporting agencies and information furnishers utilize standardized reporting and dispute resolution processes intended to promote the accuracy and consistency of consumer credit information. These include the Metro 2® reporting format developed by the Consumer Data Industry Association ("CDIA") and the Automated Consumer Dispute Verification ("ACDV") process used to communicate and investigate disputed account information. *Consumer Data Industry Association, Metro 2® Format for Credit Reporting*.

64. From a financial reporting perspective, the primary issues in this matter involve the consistency of the information furnished concerning the account, the handling of repeated disputes, the reporting and verification of significant account events, and the potential financial significance of the disputed information during subsequent lending decisions.

65. The opinions expressed in this report are limited to financial reporting practices, consumer credit reporting concepts, accepted industry standards, and the financial significance of the information reflected in the materials reviewed.

**Metro 2 Reporting Considerations**

66. The Metro 2® Format, developed by the Consumer Data Industry Association ("CDIA"), is the industry standard used by information furnishers when reporting consumer credit account information to the nationwide consumer reporting agencies. The Metro 2 reporting format is intended to promote accurate, complete, and consistent reporting of account information, including account status, payment history, delinquency, and charge-off information.

67. The Metro 2 Credit Reporting Resource Guide provides standardized reporting instructions intended to promote uniform reporting practices among information furnishers and consumer reporting agencies. In general, the reporting framework is designed to promote consistency between a furnisher's account records and the information furnished to consumer reporting agencies.

68. The materials reviewed indicate that JPMorgan Chase acknowledged in correspondence dated August 9, 2024 and November 3, 2024 that Mr. Goldson's account was charged off on March 31, 2022. Discovery materials further indicate that this information was available to, accessed, and reviewed by Chase in connection with each investigation of Mr.

Goldson's account. At the same time, the TransUnion credit reports reviewed in this matter continued to reflect a charge-off date of April 2022.

69. Chase subsequently explained that April 2022 represented the first full month during which the account was in a charged-off status. Whether that reporting methodology is consistent with Metro 2 reporting guidance depends upon the specific Metro 2 data field being reported and the reporting instructions applicable to that field. Accordingly, I do not offer a field-by-field opinion that every Metro 2 data element furnished by Chase violated a specific Metro 2 instruction. However, the absence of the complete Metro 2 transmission records does not prevent an opinion concerning the consistency and reasonableness of Chase's dispute-investigation process.

70. From a financial reporting perspective, the records reviewed identify a difference between Chase's correspondence identifying March 31, 2022 as the account charge-off date and the April 2022 charge-off information reflected on the TransUnion credit reports. That difference is material to the dispute because Chase has now stated that the March 31, 2022 charge-off date was available, accessed, and reviewed during each investigation. Consistency between a furnisher's internal account records and the information furnished to consumer reporting agencies is an important objective of standardized consumer credit reporting because lenders, creditors, and consumer reporting agencies rely upon consistent reporting of significant account events. *Consumer Financial Protection Bureau, 12 C.F.R. Part 1022, Appendix E.*

71. The records further indicate that Mr. Goldson submitted multiple disputes concerning the reported charge-off date and that Automated Consumer Dispute Verification ("ACDV") requests were transmitted to Chase during the dispute process. The available materials

establish that Chase continued to verify its reporting following those disputes while maintaining that its furnishing of information was accurate.

72. Based upon the materials reviewed, the principal issue from a financial reporting perspective is not merely that the reported dates differ by one month. Rather, the issue is whether the information furnished to the consumer reporting agencies remained consistent with Chase's own account records throughout the dispute and reinvestigation process. In my opinion, repeatedly verifying the disputed April 2022 charge-off reporting after accessing and reviewing account information reflecting a March 31, 2022 charge-off date was not consistent with accepted consumer credit-reporting investigation practices. *Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(1)*; *Seamans v. Temple University*.

73. This opinion is further supported by the repeated nature of the disputes, the absence of any audit flag, the use of productivity-based ACDV metrics, and the limited authority of ACDV processors to exercise independent judgment. Taken together, those facts support the conclusion that Chase's process created a risk that the disputed information would be verified without meaningful reconciliation against Chase's own account records.

74. Accordingly, while the available materials do not permit a field-by-field opinion concerning every Metro 2 data element transmitted by Chase, they do support a more definitive opinion concerning the reporting and investigation process. In my opinion, Chase's repeated verification of the disputed reporting, after accessing and reviewing information reflecting a March 31, 2022 charge-off date, was inconsistent with accepted consumer credit-reporting practices and with the purpose of the ACDV reinvestigation process.

**ACDV Investigation Considerations**

75. Automated Consumer Dispute Verification ("ACDV") is the standardized process through which consumer reporting agencies communicate consumer disputes to information furnishers for investigation and response. The ACDV process is administered through the e-OSCAR® system and provides a standardized mechanism for communicating disputed account information between consumer reporting agencies and furnishers.

76. The FCRA requires that, upon receipt of notice of a consumer dispute from a consumer reporting agency, the furnisher investigate the disputed information, review the relevant information provided by the consumer reporting agency, and respond appropriately before reporting the results of its investigation. The objective of the process is to promote accurate and consistent reporting of consumer credit information following notice of a consumer dispute. *Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(1)*.

77. The materials reviewed indicate that Mr. Goldson submitted multiple disputes regarding the reporting of the Chase account during 2024. Chase admitted receiving at least three ACDV forms relating to those disputes and continued to verify its reporting following the dispute investigations. Chase stated that the March 31, 2022 charge-off date was available to, accessed, and reviewed in connection with each investigation of Mr. Goldson's account.

78. The materials further indicate that Chase acknowledged in correspondence that the account was charged off on March 31, 2022 while maintaining that its reporting was accurate. The records also reflect that the reporting dispute remained unresolved following multiple dispute investigations.

79. Chase admitted that none of the ACDVs relating to Mr. Goldson's account were flagged for audit. Chase also stated that ACDV processors were evaluated, in part, based on productivity, including the number of ACDV responses processed per hour.

80. Chase's letter to the Court further indicates that ACDV processors had limited authority to exercise independent judgment and discretion when processing ACDV responses. This information is relevant because a meaningful ACDV investigation requires more than confirming prior reporting where the furnisher's own records identify information inconsistent with the reporting being verified.

81. Based upon the materials reviewed, the record supports a more definitive opinion concerning Chase's ACDV investigation process. In my opinion, repeatedly verifying the disputed April 2022 charge-off reporting after accessing and reviewing information reflecting a March 31, 2022 charge-off date was not consistent with accepted consumer credit-reporting investigation practices.

82. From a financial reporting perspective, these circumstances warrant further evaluation regarding the consistency of the information reviewed during the dispute process and the information subsequently verified and furnished to the consumer reporting agencies.

83. In my opinion, the combination of repeated disputes, Chase's access to and review of the March 31, 2022 charge-off date during each investigation, continued verification of the disputed reporting, no audit flagging, productivity-based ACDV metrics, and limited processor discretion supports the conclusion that Chase's investigation process created a risk of verification without meaningful reconciliation against Chase's own account records.

**Evaluation of Chase's Reinvestigation Process**

84. Consumer credit reporting disputes are intended to provide information furnishers with an opportunity to review disputed account information, compare that information with their internal records, and determine whether previously furnished information remains accurate. From a financial reporting perspective, an effective reinvestigation process promotes the

accuracy, consistency, and reliability of information maintained within the consumer reporting system.

85. The materials reviewed indicate that Mr. Goldson submitted multiple disputes regarding the reporting of his JPMorgan Chase account during 2024. Those disputes challenged the reporting of the charge-off date, payment history, delinquency information, and related account information. The records further indicate that Chase received multiple dispute notifications through the Automated Consumer Dispute Verification ("ACDV") process and responded by verifying its reporting.

86. The documents reviewed further establish that Chase issued correspondence dated August 9, 2024 and November 3, 2024 identifying March 31, 2022 as the account charge-off date while continuing to maintain that its reporting was accurate. Discovery materials further indicate that Chase maintained that April 2022 represented the first full month that the account was in a charged-off status.

87. From a financial reporting perspective, repeated consumer disputes concerning the same reporting issue ordinarily warrant careful comparison of the disputed information with the furnisher's account records and any additional information available during the reinvestigation process. Consistency between internal account records and information furnished following a dispute is an important component of maintaining reliable consumer credit information. *Consumer Financial Protection Bureau, 12 C.F.R. Part 1022, Appendix E*.

88. The materials reviewed reflect that Mr. Goldson submitted five disputes concerning the reporting of the Chase account between July and October 2024. The records further indicate that Chase continued to verify the reporting following those disputes while

maintaining that its reporting was accurate. The dispute chronology demonstrates that the reporting issue remained unresolved throughout the dispute process.

89. Based on Chase's verified interrogatory response, the March 31, 2022 charge-off date was not merely available in Chase's records in a general sense; Chase states that the March 31, 2022 charge-off date was available to, accessed, and reviewed in connection with each investigation of Mr. Goldson's account.

90. From a credit-reporting and ACDV investigation perspective, that admission is significant. A reasonable furnisher investigation should reconcile the disputed consumer-reporting information with the furnisher's own reliable account records, particularly where the consumer repeatedly disputes the same reporting issue and where the furnisher's own records, correspondence, and pleadings identify a different charge-off date than the date being verified through the consumer-reporting process.

91. In my opinion, to a reasonable degree of professional probability in the field of financial analysis and consumer credit reporting practices, repeatedly verifying an April 2022 charge-off reporting date after accessing and reviewing account information reflecting a March 31, 2022 charge-off date is not consistent with accepted credit-reporting investigation practices. ACDV processing is not intended to be a mechanical confirmation of prior reporting; it is intended to allow the furnisher to review the disputed information, compare it against the furnisher's own records, and correct or update information that is inaccurate, incomplete, inconsistent, or materially misleading.

92. This concern is strengthened by the repeated nature of the dispute process. The available materials indicate that Mr. Goldson submitted multiple disputes concerning the Chase tradeline and that Chase verified the disputed information without correcting the

charge-off-date discrepancy. A repeated dispute involving the same account and same disputed reporting field should create a heightened need for review, escalation, or quality control. The absence of any audit flag for the ACDVs relating to Mr. Goldson's account is inconsistent with the type of quality-control process that would be expected where the same consumer repeatedly challenges the same material reporting issue.

93. The productivity-based ACDV metric is also relevant. There is nothing inherently improper about a financial institution measuring productivity. However, where ACDV processors are evaluated based on the number of ACDV responses processed per hour, where no record is maintained showing how long the investigation took, where repeated disputes are not flagged for audit, and where processors have limited authority to exercise independent judgment, the process creates a foreseeable risk that disputes will be handled as routine data-processing tasks rather than meaningful investigations. *Consumer Financial Protection Bureau, 12 C.F.R. § 1022.42*.

94. The issue is not simply that Chase and TransUnion used different terminology. The issue is that Chase's own records and correspondence identified March 31, 2022 as the charge-off date, Chase admits that this date was accessed and reviewed during each investigation, and the disputed reporting nevertheless continued to be verified as accurate. From a Metro 2 and consumer-credit-reporting perspective, accurate and consistent reporting depends on internal consistency between the furnisher's account records, the information verified through ACDV responses, and the information appearing on the consumer report.

**Conclusion**

95. Based upon my review of the available materials, it is my opinion, to a reasonable degree of professional probability within the field of financial analysis and consumer credit

reporting practices, that the available records demonstrate a material inconsistency between Chase's own account records and correspondence identifying March 31, 2022 as the charge-off date and the April 2022 charge-off reporting that continued to be verified during the dispute process.

96. It is further my opinion that Chase's verified discovery response materially supports the conclusion that this inconsistency was not caused by the absence of available information. Chase states that the March 31, 2022 charge-off date was available to, accessed, and reviewed in connection with each investigation. Accordingly, the record supports the conclusion that Chase had access to the information necessary to identify and address the discrepancy during the ACDV investigation process.

97. In my opinion, repeatedly verifying the disputed reporting after accessing and reviewing information reflecting a March 31, 2022 charge-off date was not consistent with accepted credit-reporting and ACDV investigation practices. A reasonable investigation would require the furnisher to compare the disputed reporting against its own account records, identify the discrepancy, determine whether the reporting was inaccurate, incomplete, or materially misleading, and take appropriate steps to correct, update, or explain the reporting.

98. The record also supports the conclusion that Chase's ACDV process lacked meaningful quality-control safeguards in this instance. Mr. Goldson's repeated disputes were not flagged for audit, the processors were evaluated in part by productivity, and Chase represented that the processors had limited authority to exercise judgment and discretion. In combination, these facts support a professional opinion that Chase's process created an

unreasonable risk that repeated consumer disputes would be verified without meaningful reconciliation against Chase's own records.

99. From a credit-reporting operations and compliance perspective, the combination of five disputes, access to the correct charge-off date during each investigation, repeated verification of the disputed reporting, no audit flagging, productivity-based ACDV metrics, and limited processor discretion is consistent with a deficient investigation process and supports an opinion that Chase's handling of the disputed reporting fell below accepted consumer credit-reporting practices.

100. With respect to financial harm, the Liberty Savings Federal Credit Union materials now provide stronger support for a credit-access analysis than was available in the prior report. The April 14, 2025 application reflects a request for a $35,000 vehicle loan, and the May 20, 2025 adverse action notice states that consumer-reporting-agency information was used in connection with the decision. The application comments further state: "CHASE ACCT IS NOT HIS AND ON DISPUTE AS PER THE MEMBER," which directly connects the Chase tradeline and dispute status to the lender's review of the loan application.

101. In my opinion, these Liberty Savings materials support a conclusion that the disputed Chase reporting was considered in connection with the loan application and was financially significant to the underwriting review. Based on the present record, I can opine that the Liberty Savings materials support a causal connection between the disputed Chase tradeline and the underwriting review because the lender's own application comment specifically references the Chase account and its disputed status. Additional underwriting records, credit score data, rate sheets, and alternative financing documents would allow a more precise damages calculation.

102. All of my conclusions, statements, inferences, and opinions are made to a reasonable degree of professional probability.

103. I reserve the right to amend, modify, or supplement any opinions expressed herein should additional records, data, or materials become available.

07/06/2026

Alvaro Alban, MBA
Financial Expert